(No. 55539.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. TAFFORD LEE HOLMAN, Appellant.

*Opinion filed June 29, 1984.—Rehearing denied September 28, 1984.*

138

RYAN, C.J., and UNDERWOOD and MORAN, JJ., concurring in part and dissenting in part.

G. Joseph Weller, Deputy Defender, and Kyle Wesendorf, Assistant Defender, of the Office of State Appellate Defender, of Elgin, and Marilyn Martin, Assistant Public Defender, of Chicago, for appellant.

Neil F. Hartigan, Attorney General, of Springfield, and Edward Petka, State's Attorney, of Joliet (Michael B. Weinstein and Michael V. Accettura, Assistant Attorneys General, of Chicago, of counsel, and Gerald Pluard, law student), for the People.

JUSTICE SIMON delivered the opinion of the court:

Tafford Holman, the defendant in this capital case, was indicted for the intentional murder of Anthony Townsend (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(a)(1)), armed violence based on the aggravated kidnaping of Antoinette Townsend, Anthony's mother (Ill. Rev. Stat. 1979, ch. 38, pars. 10—1(a)(1), (2), 10—2(a)(3), 33A—2),

and home invasion (Ill. Rev. Stat. 1979, ch. 38, par. 12—11(a)(1)). A second indictment was returned four weeks later which added three counts of felony murder (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(a)(3)), all based on the killing of Anthony Townsend and predicated on the felonies of armed robbery (Ill. Rev. Stat. 1979, ch. 38, par. 18—2(a)), burglary with intent to commit a felony (Ill. Rev. Stat. 1979, ch. 38, par. 19—1(a)), and burglary with intent to commit theft (Ill. Rev. Stat. 1979, ch. 38, par. 19—1(a)). Following a jury trial in the circuit court of Will County defendant was found guilty on all counts. A sentencing hearing was held before the same jury, which found the existence of statutory aggravating factors and determined that there were no mitigating factors sufficient to preclude the imposition of the death sentence. (Ill. Rev. Stat. 1979, ch. 38, pars. 9—1(b), (c).) The court thereupon sentenced Holman to death on the felony-murder counts, and also pronounced extended sentences of 60 years' imprisonment on the intentional-murder count and 40 years' imprisonment for armed violence and for home invasion (Ill. Rev. Stat. 1979, ch. 38, pars. 1005—5—3.2(b)(2), 1005—8—2). Holman appeals directly to this court. Ill. Const. 1970, art. VI, sec. 4(b); 87 Ill. 2d R. 603.

The pajama-clad body of the victim, Anthony Townsend, was found in the early morning hours of February 22, 1980, in the kitchen of the house in Joliet where he lived with his mother and his younger brother Van. He had been shot in the side of the head and was dead. With the exception of the kitchen door, all of the outside doors to the house were open, including one leading directly into Anthony's bedroom, but a police officer, Gary Schild, who arrived at the murder scene, stated that there were no signs that any of them had been forced open. A woman's purse, identified as belonging to Mrs. Townsend, was found on the living room floor with its

contents strewn around it. Officer Schild dusted these items and the kitchen and rear door but found no fingerprints. He found two .25-caliber shell casings in the Townsend home.

Mrs. Townsend was the chief prosecution witness. She testified that she was at home with Anthony and Van on the night of February 21, 1980, and that they were watching television at 11 p.m. when she went to sleep. Sometime in the night she was wakened by a sound. She called out to her sons to see if anything was wrong; receiving no answer she rose from her bed and was confronted by a man in the doorway, whom she later identified as the defendant. The man said, "No, it's me. It's a robbery." He fired one shot in her direction and instructed her not to turn on the light or look at his face. She complied with these directions, and the man next ordered her to show him her purse. The intruder took what he wanted from it and dumped the rest on the floor. He then ordered her to go outside and "drive me." As she crossed the living room toward the door she saw Anthony lying on the floor of the kitchen. The man told her he had shot Anthony because he would not let him inside the house.

Once they were outside the house Mrs. Townsend told the intruder that she did not know how to drive, and the intruder got into the driver's seat of the Townsend car himself and commenced driving eastward from Joliet while holding her at gunpoint next to him. After arriving in Gary, Indiana, he drove around that city for a while. Next, he pulled into an alleyway and ordered Mrs. Townsend to get into the back seat of the car. After a short time a bright light shone through the window. The man ordered Mrs. Townsend out of the car and followed her out at gunpoint. When she attempted to run away, the man fired four shots at her, hitting her twice. She fell to the ground and pretended she was dead. The man

walked toward the highway and was picked up by an acquaintance a few minutes later.

According to Mrs. Townsend's testimony, a youth who had been fixing a tire by the side of the road noticed her and covered her with a leather coat which he found in the Townsend automobile, which remained where the assailant had parked it. She testified that the coat belonged to the assailant. The youth called for an ambulance, and it took her to a Gary hospital. Two Gary police detectives examined the coat in the hospital and found two gold rings and a medicine bottle in one of the pockets. The label on the medicine bottle indicated the prescription was made out to Anne Mae Williams, whom Lieutenant Wayne Brown, one of the detectives, visited twice at her Gary address.

On Brown's first visit, according to his testimony, he received no answer to his knock at the door but noticed a letter addressed to "T. Holman" in the open mailbox. He contacted Williams several days later and she took him to another house in Gary, from which she emerged with a photograph of a man wearing two rings on his left hand. This photograph was admitted into evidence over objection. An objection was sustained to Brown's statement that in his opinion the rings were the same as the ones taken from the coat. However, Brown was permitted to testify, over objection, that the man depicted in the photograph was the defendant. Williams did not testify.

During her stay in the hospital Mrs. Townsend was shown several photographs from the police files and identified one photograph as that of her abductor. At trial she was shown the same photographic lineup and identified the defendant as the man whose picture she had picked.

The defendant did not testify at the guilt phase of the trial but did so, against the advice of his attorney, at the

first stage of the sentencing hearing. His version of events was that he had been drinking and visited relatives with two men, whose names he gave as Boogie and Zeich, during the evening in question. This was generally corroborated by several of Holman's relatives who also testified at this stage. Holman testified that he also visited his father, and that after this visit he and Zeich proceeded to the Townsend house, apparently because the defendant thought there had been a misunderstanding between Anthony Townsend and the defendant's father. Anthony recognized the defendant and admitted the two men through the door leading into his room, whereupon Holman questioned him about the earlier misunderstanding and an argument ensued. According to Holman's testimony, Zeich shot Anthony with no warning during the argument. Holman, who claimed he was drunk, panicked and tried to find an exit and heard a second shot while he was searching, but by the time he found the front door Zeich had fled and Mrs. Townsend had wakened and recognized him. He decided at this point to abduct her and, after rummaging through her purse for the keys to the Townsend car, he left for Gary, his home city, without taking anything of value from inside the house. He indicated that his intention had been merely to secure her car for getaway purposes and to release Mrs. Townsend once he reached the highway to Gary, but that the appearance of a police car at that point forced him to continue on to Gary before releasing her. He admitted firing one or several shots at her in Gary when she tried to flag down a passing police car.

At the hearing in aggravation and mitigation, evidence was introduced of a 1975 conviction of the defendant for robbery and a 1970 conviction for armed robbery, both of which resulted in prison sentences, and a 1966 adjudication of delinquency in connection with the robbery, abduction and sexual assault of a man. In addition,

Thomas Wilson, a former Illinois judge, testified that in 1968 he sentenced Holman to prison for the misdemeanors of reckless conduct and unlawful use of a firearm, to which Holman had pleaded guilty. Judge Wilson could not recall whether Holman was represented by an attorney at any time during the proceedings, and although the docket sheet showed that at one point Holman stated he would obtain his own attorney there was no indication that he had done so.

The warden of the jail at which Holman was being held pending trial in this case testified that he received a note from an inmate which purported to solicit an assault on a lady who lived at Mrs. Townsend's address. The writer mentioned a desire to obtain a gun and gave as a reason for the assault the fact that the lady's son had "jumped on" the writer's father. The inmate who gave the warden the note told him that Holman had written the letter.

Mrs. Townsend testified that she had not heard of Holman prior to the assault and that because the family was a close one Anthony would have told her of any difficulties that he had had with a man named Holman, but he had never mentioned any. She further testified that Anthony was an honor student who had made Who's Who in American High Schools, worked as a salesman part time, and had never been in an altercation to her knowledge.

Officer Brown testified that Williams had told him that Holman had handled her .25-caliber pistol prior to the Townsend incident but had put it back when she had asked him to do so. However, she told Officer Brown that he had been with her in Gary on the night of the shooting, had told her he needed money, and had left without her noticing, and that when she woke up in the morning the pistol was gone along with a bag of ammunition.

Holman resumed the stand and reiterated his earlier testimony that it was Zeich who had killed Anthony. He admitted firing at Mrs. Townsend and writing the note while in custody awaiting trial. He also admitted committing the 1970 armed robbery but denied having sexually assaulted anyone.

This appeal involves numerous issues concerning the propriety of the various murder convictions and the conviction for home invasion, as well as the death sentence and the other sentences imposed. We will treat first those issues common to all of the murder convictions which arose at the guilt portion of the trial.

## I. THE GUILT PHASE

Holman first challenges certain testimony which he claims was hearsay. In attempting to establish a link between Holman and the coat which was found in the back seat of the Townsend car, the prosecutor questioned Officer Brown as follows:

"Q. Did you have occasion to show Anne Williams this prescription pill bottle and those marked 12-A and B, the gold and diamond rings?
A. Yes.
Q. Did you ask her if she could identify them?
A. Yes.
Q. And pursuant to your conversation about those rings and that pill bottle, did she take you anywhere?

\* \* \*

A. Yes, she did."

Officer Brown went on to testify about receiving the photograph from Williams; on admission of this photograph into evidence Brown identified Holman as the man portrayed. Brown never testified directly as to Williams' statements, nor did he say that Williams identified Holman as the owner of the rings. However, it is argued that the assertive responses of Williams referred to in

Brown's testimony quoted above are tantamount to an identification by Williams, and that the admission of Brown's testimony concerning his half of the conversation with Williams impermissibly "allow[ed] the responses of the other party [Williams] to be a subject for the deductive powers of the trier of fact" (*People v. Spivey* (1978), 58 Ill. App. 3d 677, 679; *People v. Warmack* (1976), 44 Ill. App. 3d 243, 246).

The fundamental purpose of the hearsay rule is to test the value of assertions by exposing the source of the assertion to cross-examination by the party against whom it is offered. (*People v. Carpenter* (1963), 28 Ill. 2d 116, 121; see *People v. Rogers* (1980), 81 Ill. 2d 571, 577-78; 5 Wigmore, Evidence sec. 1362, at 3-10 (Chadbourn rev. ed. 1974).) Application of the rule to overturn the outcome of a trial supposes that the testimony under attack was offered to establish the truth of a matter asserted or clearly indicated in the testimony and rested for its value upon the credibility of an out-of-court declarant. *People v. Rogers* (1980), 81 Ill. 2d 571, 577.

While it is possible that the jury might have concluded from Officer Brown's statements that Williams identified the defendant as the man to whom the rings found in the coat belonged, that is only one possible interpretation of her response. According to Brown's testimony, her full response was to give him a picture of a man wearing similar rings; she did not name the man or say in any more assertive fashion either that the rings found in the coat belonged to the man depicted or that the man in the photograph was the defendant. The eventual linking of Holman to the rings and the coat came from Brown's own in-court identification of him as the man in the photograph, not from anything Williams said or indicated: in fact, other than the photograph itself and the words "T. Holman" on an envelope found by chance inside Williams' mailbox, the jury had no evi-

dence from which it could infer that Williams knew Holman at the time it had to decide the question of his guilt.

We conclude that, unlike the testimony in *People v. Spivey* (1978), 58 Ill. App. 3d 677, on which the defendant relies, the testimony complained of here did not have the natural effect of informing the jury of an identification of the defendant by an out-of-court declarant, but simply had its intended effect of recounting the steps Brown took in investigating the ownership of the coat and providing a background for the photograph whose subject Brown identified. Brown was available for cross-examination at all times, and virtually all of the vital links in the identification could have been tested by cross-examining him. (*People v. Rogers* (1980), 81 Ill. 2d 571, 579-80; *People v. Carpenter* (1963), 28 Ill. 2d 116, 121.) There was no impermissible use of hearsay testimony.

Holman next argues that the admission of the photograph into evidence was error because no foundation had been laid for its admission other than Officer Brown's uninformed statement of opinion that the man it depicted was the defendant and his further statement of opinion, stricken following an objection by defense counsel, that the rings depicted in it were the ones found in the coat. In a related contention, the defendant argues that the opinion testimony of Brown as to the identity of the man portrayed was improper because Brown had no personal knowledge of any facts which would have aided him in such an identification.

"In order to have a photograph admitted in evidence it is necessary that the photograph be identified by a witness as a portrayal of certain facts relevant to the issue and verified by such witness on personal knowledge as a correct representation of the facts. The witness need not be the photographer, nor need he know any-

thing of the time or condition of the taking, but he must have personal knowledge of the scene or object in question and testify that it is correctly portrayed by the photograph." (*People v. Thomas* (1967), 88 Ill. App. 2d 71, 80-81.) In this case the photograph was important not for its depiction of the way the defendant appeared at a certain time, as in *People v. Donaldson* (1962), 24 Ill. 2d 315, and *People v. Beverly* (1978), 63 Ill. App. 3d 186, but rather for its depiction of an individual who could be identified as the defendant. It was thus not necessary that Officer Brown be familiar with Holman's appearance at the time the picture was taken or with the circumstances under which the picture was taken as long as he was familiar enough with Holman's general appearance to be able to say with some degree of certainty that the picture was of him. Officer Brown had the opportunity to observe Holman both in the courtroom and before the trial; in fact, he was the arresting officer. It was within the discretion of the trial judge to admit the photograph into evidence on the basis of Brown's identification. *People v. Thomas* (1967), 88 Ill. App. 2d 71, 81; *Brennan v. Leshyn* (1964), 51 Ill. App. 2d 132, 139.

For similar reasons we find no fault with the trial court's decision to permit Officer Brown to testify that the photograph depicted Holman. The cases cited by Holman (*People v. Garrett* (1975), 62 Ill. 2d 151; *People v. Wallenberg* (1962), 24 Ill. 2d 350) are inapposite, for they involved subjects which required scientific knowledge or knowledge of special facts. No special knowledge other than acquaintance with the person named in the identification is required to identify a person depicted in a photograph. In fact, each juror could have reached the same conclusion by looking at the photograph and the defendant in the courtroom.

Holman next takes issue with the following statement made by the prosecutor in his closing argument to the

jury:

> "In the Sixth Amendment of the Bill of Rights, there is a small provision which holds and states that the defendant has the absolute right to compulsory process, to process witnesses. He could have produced Anne Williams. All he'd have to do is get a court order from the judge. This judge would order the Sheriff of this County to grab that woman and bring her in a ball and chain and handcuffs, if necessary, and absolutely require her to testify, provided she did not incriminate herself, and there is nothing the State could have done."

This was represented by the State as a response to defense counsel's earlier suggestion in closing argument that because Williams had been available to the State as a witness but had never been called to testify, it could be inferred that her testimony would have been damaging to the prosecution. Holman's objection was overruled.

Ordinarily, the prosecution may not comment unfavorably upon a defendant's failure to produce a witness, at least if it is not made clear that the witness was readily accessible to the defense and not equally accessible to the prosecution with the exercise of ordinary diligence. (See *People v. Munday* (1917), 280 Ill. 32, 42, 47; *People v. Johnson* (1968), 102 Ill. App. 2d 443, 454.) However, reviewing courts in this State have consistently held that comment on the failure of a potential defense witness to testify is permitted when made in response to defense counsel's own reference to the State's failure to call the witness to the stand. *People v. Smith* (1962), 24 Ill. 2d 198, 200; *People v. Izzo* (1958), 14 Ill. 2d 203, 213-14; *People v. Wheeler* (1955), 5 Ill. 2d 474, 485-86.

In this case, the prosecutor's comments were in response to defense counsel's argument that "[t]he State says there's an Anne Mae Williams out there somewhere. She's not here. She didn't testify. *** They didn't bring her here." This statement raised the inference that

the prosecutor's case would have been compromised by Williams' appearance. The response was properly limited to the provocation (see *People v. Heywood* (1926), 321 Ill. 380, 383), and although the description of the mechanics of serving a subpoena was perhaps unnecessarily vivid, the prosecutor did not dwell on defense counsel's failure to produce Williams to such an extent as to reflect unduly on Holman's culpability. We do not feel that a new trial is required because of the prosecutor's comments, especially in view of the convincing nature of the evidence of Holman's guilt of the murder charges which he failed to contradict or rebut in the guilt phase of his trial. See *People v. Bartall* (1983), 98 Ill. 2d 294, 323.

Holman's next contention is that the selection of his jury according to the principles of *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770, which permit the State to exclude for cause all those who indicate that they would automatically vote against the imposition of capital punishment without regard to the evidence that develops at trial or that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's guilt, resulted in a jury that was biased in favor of conviction and did not represent a fair cross-section of the community. The argument that a *Witherspoon*-qualified jury is unduly conviction-prone has been rejected on the basis of the insufficiency of the available statistical evidence by recent decisions of this court (*e.g., People v. Free* (1983), 94 Ill. 2d 378, 401-02, *cert. denied* (1983), 464 U.S. 865, 78 L. Ed. 2d 175, 104 S. Ct. 200; *People v. Tiller* (1982), 94 Ill. 2d 303, 321-22; *People v. Lewis* (1981), 88 Ill. 2d 129, 147, *cert. denied* (1982), 456 U.S. 1011, 73 L. Ed. 2d 1308, 102 S. Ct. 2307), as well as by the Federal circuit courts and courts of other States which have considered the issue (*e.g., Smith v. Balkcom* (5th Cir. 1981), 660 F.2d 573, 582; *United States ex rel.*

*Clark v. Fike* (7th Cir. 1976), 538 F.2d 750, 761-62, *cert. denied* (1977), 429 U.S. 1064, 50 L. Ed. 2d 781, 97 S. Ct. 791; *State v. Avery* (1980), 299 N.C. 126, 138, 261 S.E.2d 803, 810). Only one court has accepted this contention to date. See *Grigsby v. Mabry* (E.D. Ark. 1983), 569 F. Supp. 1273.

We note that a considerable amount of scholarly research has been done on the impartiality of *Witherspoon*-qualified juries since the *Witherspoon* case was decided. (See studies cited in *Grigsby v. Mabry* (E.D. Ark. 1983), 569 F. Supp. 1273, 1294-1305, and *Hovey v. Superior Court* (1980), 28 Cal. 3d 1, 27-60, 616 P.2d 1301, 1315-41, 168 Cal. Rptr. 128, 142-68.) However, Holman has failed either to cite any studies completed since our decisions in *Free, Tiller* and *Lewis* were rendered or to explain in any detail what the findings of the earlier studies mean. We adhere to our earlier holdings that the State was properly permitted to conduct death-qualification proceedings on *voir dire*.

Holman argues that four of the jurors who were excluded for cause as a result of the death-qualification proceedings did not qualify for such exclusion under *Witherspoon v. Illinois,* and, therefore, he should receive a new trial as to guilt. In both *Witherspoon* and *Adams v. Texas* (1980), 448 U.S. 38, 65 L. Ed. 2d 581, 100 S. Ct. 2521, the jury from which jurors were found to have been improperly excluded for cause decided both the question of guilt and the penalty to be imposed. In both cases the Supreme Court reversed the death penalty but did not disturb the verdict of guilt. Although the Supreme Court has never held squarely that such a verdict is not subject to challenge on grounds of failure to comply with *Witherspoon,* there is likewise no indication from its holdings that it views the question as an open one. For these reasons we decline to treat his contention that there were *Witherspoon* violations in the selection

of his jury as a proper ground for vacating the verdicts of guilt.

Holman's final argument concerning the propriety of his convictions is that the indictment under which he was tried should have been dismissed because of improper delaying tactics on the part of the prosecution which resulted in failure to hold a preliminary hearing. Holman was first charged with the murder of Anthony Townsend in a complaint issued on February 25, 1980, and following his arrest in November 1980 and his first appearance in the Will County circuit court on February 14, 1981, a preliminary hearing was set for March 9, 1981. On March 5 the prosecution moved to have Anne Mae Williams certified as a witness to compel her attendance at a March 18 grand jury proceeding and requested that the preliminary hearing be continued for two weeks pending her appearance before the grand jury. The court continued the preliminary hearing until March 24, 1981. On March 18 the grand jury returned a three-count indictment charging Holman with murder, armed violence and home invasion, without the benefit of Williams' testimony.

Holman contends that Williams' presence was not material or necessary because she was never called before the grand jury, and that Dave Davis, the only witness listed as appearing in the March 18 grand jury proceedings, was available to the State at all times prior to that date. The motion for certification, he therefore reasons, was but a subterfuge for the purpose of delaying the preliminary hearing. He argues first that the Illinois Constitution requires the dismissal of charges as a sanction for bad-faith delay of a preliminary hearing.

Our constitution provides:

"No person shall be held to answer for a crime punishable by death or by imprisonment in the penitentiary unless either the initial charge has been brought by indict-

ment of a grand jury or the person has been given a prompt preliminary hearing to establish probable cause." (Ill. Const. 1970, art. I, sec. 7.)

This court has recognized that continuance of a preliminary hearing for the sole purpose of permitting a grand jury to indict a defendant being held in custody is not to be condoned under this provision and has suggested that "appropriate sanctions might be considered" to deter such conduct by the prosecution. (*People v. Hood* (1974), 59 Ill. 2d 315, 324.) However, this court has ruled that dismissal with prejudice is not available to a defendant as a sanction. (*People v. Howell* (1975), 60 Ill. 2d 117, 120; *People v. Hendrix* (1973), 54 Ill. 2d 165, 169.) Rather, the existence of other possible remedies for this type of delay, such as presuming the involuntariness of any statements made by the defendant during the delay and applying an exclusionary rule to them, have been noted. This court has held, however, that the fashioning of a remedy is a legislative rather than a judicial matter. (*People v. Howell* (1975), 60 Ill. 2d 117, 122-23.) As of the time the trial court passed on Holman's motion to dismiss the indictment, the legislature had not acted on this subject, although it has since (Pub. Act 83—644, eff. Jan. 1, 1984).

Holman urges us to follow *People v. Kirkley* (1978), 60 Ill. App. 3d 746, in which the appellate court expressed the view that dismissal of the charges with prejudice was the only effective way of implementing the constitutional guarantee here at issue because of the legislature's failure to provide guidelines in the matter of sanctions. This case is not comparable to *Kirkley,* in which the return of the indictment 176 days after the defendants' arrest and 148 days after the originally scheduled date for the preliminary hearing prompted the observation that the violation of the constitutional provision guaranteeing a prompt preliminary hearing was the

worst that had ever occurred. Holman's indictment was returned only nine days after the originally scheduled date for the preliminary hearing, and Holman has not contended that the length of time intervening between his arrest and the date originally set for the hearing was in any way attributable to the State. Thus, even if the constitutional provision requires that the determination be made by preliminary hearing whenever a grand jury indictment is not initially returned (see *People v. Hood* (1974), 59 Ill. 2d 315, 324; 7 Record of Proceedings, Sixth Illinois Constitutional Convention 2600 (1970)), it would be inappropriate for this court to take the matter of sanctions into its own hands where, as here, probable cause was determined with reasonable promptness by a grand jury (*People v. Howell* (1975), 60 Ill. 2d 117, 119; see *People v. Rush* (1980), 91 Ill. App. 3d 366), and the defendant has made no attempt to show how the delay of nine days prejudiced him.

Holman also argues that the absence of a preliminary hearing in this case violated Federal guarantees of due process (U.S. Const., amends. V, XIV) so as to require dismissal of the charges. This argument is based on the suggestion made in *United States v. Marion* (1971), 404 U.S. 307, 324, 30 L. Ed. 2d 468, 481, 92 S. Ct. 455, 465, that due process "would require dismissal of the indictment if *** the delay [in bringing it] was an intentional device to gain tactical advantage over the accused" and the recognition in *United States v. Lovasco* (1977), 431 U.S. 783, 795, 52 L. Ed. 2d 752, 762, 97 S. Ct. 2044, 2051, that a due process inquiry must include consideration of the reasons for the delay as well as an assessment of the prejudice the defendant suffered. The defendant, however, must bear the initial burden of showing that he has been significantly prejudiced, and only after such a showing does the burden shift to the government to demonstrate the reasonableness of the

delay. See *People v. Lawson* (1977), 67 Ill. 2d 449, 459; *United States v. Townley* (5th Cir. 1982), 665 F.2d 579, 581-82, *cert. denied* (1982), 456 U.S. 1010, 73 L. Ed. 2d 1307, 102 S. Ct. 2305; *United States v. King* (7th Cir. 1979), 593 F.2d 269, 272.

Just as " '[a] general allegation of loss of witnesses and failure of memories is insufficient to establish prejudice' " (*United States v. McGough* (5th Cir. 1975), 510 F.2d 598, 604), an undocumented assertion, such as Holman makes, that a preliminary hearing would have produced a "possibly impeaching transcript" had it been held likewise falls short of establishing prejudice. Holman has not otherwise explained how he has suffered actual and substantial prejudice as a result of his having failed to receive a preliminary hearing, and we therefore need not inquire into the motives for the State's actions. *People v. Lawson* (1977), 67 Ill. 2d 449, 459-60.

No error during the guilt phase of the trial has been demonstrated. We therefore affirm the finding that Holman was guilty of Anthony Townsend's murder, as well as the conviction of armed violence which is not challenged further in this appeal.

## II. THE HOME INVASION CONVICTION

Holman argues that his convictions of home invasion and felony murder based on burglary cannot stand because the evidence fails to establish beyond a reasonable doubt that his entry into the Townsend home was unauthorized. (See *People v. Medreno* (1981), 99 Ill. App. 3d 449, 455.) He contends that the consensual nature of his entry is established by the absence of any physical evidence of force near any of the doors at the time the police arrived, Mrs. Townsend's testimony that the door to Anthony's room was open when she and Holman left the house through it, and the stipulated testimony of a Gary police officer that shortly after she was brought to the

hospital Mrs. Townsend told him that Anthony had let Holman into the house to use the telephone.

This argument is without merit. The absence of physical signs of forced entry does not necessarily indicate that an entry was consented to. The evidence in this case is not inconsistent with Mrs. Townsend's version of events based on what she stated Holman told her, which was that he shot Anthony and that he had forced his way into the house after Anthony had opened his door part way and decided not to allow him to enter. In addition, Mrs. Townsend denied telling anyone, as Holman contended she had, that Anthony had let Holman in to use the telephone and stated that, inasmuch as Holman had not himself told her this, she did not know how she could have known it. The jury could reasonably have believed her testimony at trial and found beyond a reasonable doubt that Holman entered the house without authority. The conviction of home invasion is affirmed. Ill. Rev. Stat. 1979, ch. 38, par. 12—11(a)(1).

### III. THE EXTRA MURDER CONVICTIONS

Holman and the State agree that because only one homicide occurred, three of the four convictions of murder must be vacated. (See *People v. Brownell* (1980), 79 Ill. 2d 508, 524; *People v. Bone* (1982), 103 Ill. App. 3d 1066, 1068; *People v. Jacobs* (1976), 44 Ill. App. 3d 290, 291.) They also agree that two of the felony-murder convictions based on burglary should be vacated, and we approve this agreement.

Holman argues that the third felony-murder conviction, the one based on armed robbery, should also be vacated in favor of the intentional-murder conviction. The State, on the other hand, contends that this felony-murder conviction should stand because the aggravating factor on which it relied for purposes of seeking the death penalty was that the murder took place in the course of

an armed robbery (Ill. Rev. Stat. 1979, ch. 38, par. 9—
1(b)(6)). The disagreement between the parties is difficult
to understand inasmuch as the aggravating factor relied
upon requires the State to establish not only that the
murder occurred in the course of one of various specified
felonies, but also that it was committed "by the defend-
ant and not by another party to the crime" (Ill. Rev.
Stat. 1979, ch. 38, par. 9—1(b)(6)(a)) and was committed
"intentionally or with the knowledge that the acts which
caused the death created a strong probability of death or
great bodily harm" (Ill. Rev. Stat. 1979, ch. 38, par. 9—
1(b)(6)(b)) to the victim or another individual, factors
which are not elements of felony murder and are not
proved by a conviction of felony murder standing alone.
However, because we find it necessary to remand the
cause for a new sentencing hearing and because any of
the murder convictions might support a death sentence
under the facts of this case, we believe the State has the
right to elect which of the convictions should be re-
tained.

Holman contends that the State cannot rely upon any
of the felony-murder convictions because the procedure
used to obtain the indictment which added those counts
was improper. Specifically, he argues that the prosecu-
tor's request to the grand jury to recollect the testimony
it had heard four weeks earlier, unaccompanied by any
summary of that testimony or any presentation of new
testimony by live witnesses, violated the due process
guarantees of the Federal Constitution. He also argues
that because only 18 grand jurors were present at the
original proceeding while 20 were present at the second,
it is not possible to determine that a quorum of 16 grand
jurors out of the original panel of 23 had the information
necessary to return the felony-murder indictments, as
Holman argues is required by the statutes of this State.
See Ill. Rev. Stat. 1979, ch. 78, par. 16.

This attack upon the grand jury proceedings is not valid in this case. The quorum requirement mentioned by Holman refers only to how many jurors of the panel of 23 must be present to "constitute" a grand jury at any one time. The same act provides that "[n]o grand jury shall make presentments of their own knowledge, upon the information of a less number than 2 of their own body." (Ill. Rev. Stat. 1979, ch. 78, par. 19.) This section controls the instant case, and from the numbers recited above it is apparent that no fewer than 15 of the members of the second grand jury quorum attended the first grand jury proceeding and heard the evidence presented there.

Holman, citing *People v. Rodgers* (1982), 92 Ill. 2d 283, and *People v. Curoe* (1981), 97 Ill. App. 3d 258, urges that an indictment may not be based solely on the recollection of the grand jurors of the testimony presented to them at an earlier date. There are significant differences between this case and *Rodgers* and *Curoe*. In *Rodgers* this court ruled only that an indictment had to be supported by some evidence tending to show the existence of probable cause. In *Curoe,* a case in which the second grand jury was different from the first and was apprised of the relevant facts only by the unsworn testimony of the prosecutor summarizing testimony adduced before the first grand jury, the appellate court dismissed the indictment because no competent testimony had been presented to the second grand jury and there was "[no] evidence that the [second] grand jury indicted defendant on the basis of the personal knowledge of two or more of [its] members" (97 Ill. App. 3d 258, 268-69). In this case at least 15 members of the second grand jury heard both the prosecutor's request and the earlier testimony of which he reminded the jurors: the earlier testimony served as evidence bearing on the existence of probable cause, while the grand jurors' recollection of it certainly

constituted "personal knowledge of two or more" of them so as to satisfy the statutory requirement underlying the *Curoe* decision.

For similar reasons we find the Federal cases cited by Holman not in point. *United States v. Hodge* (5th Cir. 1974), 496 F.2d 87, *United States v. Mahoney* (E.D. Pa. 1980), 495 F. Supp. 1270, *United States v. Braniff Airways, Inc.* (W.D. Tex. 1977), 428 F. Supp. 579, and *In re Grand Jury Investigation* (D. Md. 1963), 214 F. Supp. 856, all involved two distinct grand juries, the second of which learned the relevant facts only through a summary of testimony presented to the first. Nor is it a matter of concern in this case that the predicate felonies for the three felony-murder charges were not charged by the grand jury when it first convened. As we have stated, a grand jury may indict a defendant on the basis of the personal knowledge of two or more of its members. Holman has not demonstrated that the information which the 15 or more grand jurors who heard the original testimony gained from it would not qualify as personal knowledge relevant to those felonies.

## IV. THE SENTENCING PHASE

We next consider errors that Holman asserts occurred in the sentencing phase of his trial. These errors require a new sentencing hearing.

Holman points to various statements made by the prosecutor in his initial closing argument in the second stage of the sentencing hearing which highlighted the possibility that Holman might kill again if he were sentenced to prison rather than executed. At various points in his argument the prosecutor said:

> "The reason that I [believe capital punishment serves a useful purpose] is that there are other potential victims, innocent people, whose lives are out there. They have done nothing that deserves being executed by cold-

blooded killers, and if we have capital punishment in this State and in this country, it is my contention that some of those innocent people, not all, but some of those innocent people's lives may be spared.

\* \* \*

I contend this, if capital punishment does not deter others, and we execute someone who is convicted of murder, the only thing that we have done—I don't mean to take that lightly—the only thing that we have done is to execute a person who most needs deterrence, *a person who has already killed. We will not afford him an opportunity to escape from prison. We will not afford him the opportunity to kill the prison guards* \* \* \*.

\* \* \*

[A]nd we can show and we believe that capital punishment deters some killings, so that some future victims', our fellow citizens' in this county and this State and land, lives will be spared.

*What we have, in effect, done by not imposing capital punishment in the proper case is to slaughter, ensure that other innocent people will be killed.*

Now, \* \* \* if we are to spare a convicted murderer's life because we suddenly feel that the sanctity of that convicted killer's life is such that it should not be forfeited when you kill someone else, then what we are, in effect, saying is that *the sanctity of life of a convicted killer means more than the sanctity of life of an innocent future victim.*

Think about that. *You will come down on the side of a convicted killer, a convicted murderer, and say, no, he should not be put to death, even though this is the proper case, thereby, virtually, guaranteeing down the road future innocent victims will be slaughtered."* (Emphasis added.)

While these remarks were made in the context of the prosecutor's explanation of the deterrence rationale for the death penalty, the italicized passages can only be interpreted as referring to Holman; the State does not contend otherwise. The clear import of the prosecutor's

words is that the jury, by sentencing Holman to prison, would run the risk that he would kill a prison guard or would escape and kill again.

The United States Supreme Court has emphasized that "[i]t is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion." (*Gardner v. Florida* (1977), 430 U.S. 349, 358, 51 L. Ed. 2d 393, 402, 97 S. Ct. 1197, 1204.) To conform to this mandate as well as to insure "that degree of respect due the uniqueness of the individual" (*Lockett v. Ohio* (1978), 438 U.S. 586, 605, 57 L. Ed. 2d 973, 990, 98 S. Ct. 2954, 2965), courts have required that the focus in death penalty hearings be on the character and record of the offender and the facts and circumstances surrounding the offense (*Woodson v. North Carolina* (1976), 428 U.S. 280, 304-05, 49 L. Ed. 2d 944, 961, 96 S. Ct. 2978, 2991; *People v. Szabo* (1983), 94 Ill. 2d 327, 366; *People v. Walker* (1982), 91 Ill. 2d 502, 515; *People v. Gleckler* (1980), 82 Ill. 2d 145, 162; *People v. Carlson* (1980), 79 Ill. 2d 564, 590). This court has frequently stressed that evidence must be excluded from the sentencing hearing if it does not bear on the aggravating or mitigating factors in a given case, the circumstances of the offense or the character or rehabilitative potential of the particular defendant. *People v. Szabo* (1983), 94 Ill. 2d 327, 366-67; *People v. Walker* (1982), 91 Ill. 2d 502, 515; see also *People v. Riley* (1941), 376 Ill. 364, 367-68.

Parties in closing argument may not go beyond the scope of the evidence presented and facts fairly inferable therefrom (*People v. Beier* (1963), 29 Ill. 2d 511, 517; *People v. Rothe* (1934), 358 Ill. 52, 56), and it may not be assumed in the absence of evidence that a person convicted of murder will escape from prison or commit another murder. In this case the only evidence which could

even remotely support the prosecutor's assertions is the testimony that defendant was found guilty of various violent crimes prior to the one for which he was tried here and the fact that the letter containing the solicitation of Mrs. Townsend's death was Holman's second indication that he wanted to take her life. Nowhere is there any suggestion that Holman would escape from prison or kill a guard, and inasmuch as his unrebutted testimony was that he had plans to kill Mrs. Townsend while he was in custody only because he feared that she would testify against him, we consider the fact of his attempts on her life to be at best an unreliable indicator of his likely conduct toward her or anyone else if he were someday released from prison.

Even if the prosecutor's statements were supported by evidence, their prejudicial effect outweighs their probative value. On the basis of the record before us the future behavior of Holman as referred to by the prosecutor was merely "a speculative possibility that may or may not occur" (*People v. Walker* (1982), 91 Ill. 2d 502, 515). The likely, if not the inevitable, effect of such graphic remarks is to focus the jury's attention on extraneous fears and divert it from considering the aggravating and mitigating factors presented by the case, the character and record of the defendant and the nature and circumstances of his offense. (*People v. Szabo* (1983), 94 Ill. 2d 327, 366; see *People v. Walker* (1982), 91 Ill. 2d 502, 515.) The likelihood that this occurred is increased here, where the prosecutor's statements appear not once but several times in the course of closing argument and culminate in the bald assertion that by not sentencing the defendant to death the jury would be "virtually, guaranteeing down the road future innocent victims will be slaughtered."

In both *Szabo* and *Walker* this court decided that it was reversible error to call to the jury's attention the

possibility that if sentenced to prison the defendant might be paroled. In *Walker* the death sentence was reversed even though the State had argued credibly that defense counsel's argument invited the prosecutor's remarks. In *Szabo* we observed:

> "The role of the State's Attorney is not to speculate as to what might happen should the death penalty not be invoked. ***
>
>    ***
>
>    *** The sentencing hearing is not intended to provide a soap box on which counsel can prey upon the fears of the jurors that the defendant may soon walk the streets again in search of another victim." (94 Ill. 2d 327, 366-67.)

Unsupported predictions as to the kind of crimes the defendant will commit if not executed are even more to be condemned than references to the possibility of parole, for they convey more directly to jurors the vivid, but misleading, message that the death penalty is the only way to protect society from the defendant and forestall his violence. (See *People v. Murtishaw* (1981), 29 Cal. 3d 733, 773, 631 P.2d 446, 470, 175 Cal. Rptr. 738, 762, *cert. denied* (1982), 455 U.S. 922, 71 L. Ed. 2d 464, 102 S. Ct. 1280.) The statements made here had no function other than to appeal to the passions and fears of the jury and increase the likelihood that the sentence it would recommend would be based on emotion rather than on reason.

To somewhat similar if less graphic effect were statements made by the prosecutor in rebuttal closing argument, ostensibly in reply to an argument by defense counsel that Holman's impoverished background was to blame for his actions:

> "*** [Y]ou can get ahead in this country if you truly try, if you try to make something of yourself.
>
>    Mrs. Townsend told you about her family. Tony, Who's Who in America. He made that, and that's a very

high honor. He graduated early with honors. Another son, who is a planner in the Department of Children and Family Services, and they're black, but there's a little bit of difference between Antoinette Townsend and her kind and that savage killer there.

Mrs. Townsend has something that is a necessary component, in my opinion, of being a decent human being. She has religious moral fiber. ***"

Examination of the record reveals, however, that defense counsel did not argue to the jury that Holman's poverty was a cause of his actions; he merely contended that Holman was drunk when he was inside the Townsend house and that his criminal activity was due to his having developed a "penitentiary life-style" while serving his earlier prison sentences. The prosecutor's comments were not invited by the defense, and we believe that the discussion of Anthony Townsend's accomplishments and surviving members of his family was an improper appeal to the emotions of the jurors.

In *People v. Bernette* (1964), 30 Ill. 2d 359, 371, a death case, this court stated that it has "consistently condemned the admission of evidence that the deceased left a *** family, inasmuch as such evidence has no relationship to the guilt or innocence of the accused or the punishment to be inflicted upon him, but serves ordinarily only to prejudice him in the eyes of the jury." (See, e.g., *People v. Gill* (1973), 54 Ill. 2d 357, 368; *People v. Gregory* (1961), 22 Ill. 2d 601, 605-06; *People v. Dukes* (1957), 12 Ill. 2d 334, 340; *Filippo v. People* (1906), 224 Ill. 212, 217.) In this case the prosecutor informed the jury not only that the deceased had a brother who worked for the State, but also that his mother had "religious moral fiber" (suggesting, as made clear by the prosecutor's very next words, that Holman's failure to appreciate her "talking about religion" made him more deserving of the death penalty) and that the murder vic-

tim was unusually bright and had received various honors (suggesting that the family's loss was the greater and that Holman's crime was therefore more heinous). Each of these diatribes in the course of a fairly short rebuttal had potential for distracting the jurors from their task of balancing aggravating and mitigating factors and "arous[ing] in them anger, hate and passion" for Holman (*People v. Dukes* (1957), 12 Ill. 2d 334, 340) and sympathy for the Townsends. These arguments were not necessary to illustrate the prosecutor's contention to the jury that "you can get ahead in this country if you truly try, if you try to make something of yourself," a proposition which, if not self-evident, was illustrated by the prosecutor's reference to his grandparents and to the jurors' ancestors which immediately preceded the quoted remarks. (See *Filippo v. People* (1906), 224 Ill. 212, 217.) Nor can the remarks be justified as fair commentary on properly admitted testimony. Even if Mrs. Townsend's testimony at the sentencing hearing, in which she mentioned Anthony's scholastic record and awards as well as the names and occupations of her husband and her other five children, were properly admitted to rebut Holman's testimony that Anthony had had a dispute with his father and became hostile when Holman approached him in his house, the context of the prosecutor's remarks shows that they were not designed to rebut Holman's story.

Holman next points out three instances in the prosecutor's closing argument when the jury was misled as to the legal basis for imposing the death penalty. In his initial closing argument the prosecutor stated:

"In the first part of this proceeding, the trial of this case, there was a lot of to-do, a lot made of the fact that what we were dealing with here, not a felony murder, it was for lack of a better word, simple murder, because if you found it to be a murder without the statutory aggravating factors for forcible felonies there would be no death

> penalty hearing, and last Friday, you returned unanimous verdicts of all six counts finding three counts of felony murder and one count of murder."

The context of this comment shows that it was made in an attempt to remind the jury that it had already determined that Holman was guilty of murder and had found as an aggravating factor that the murder was committed in the course of various felonies. Such a reminder is permissible, and we do not question that the remark was made in good faith with this in mind. However, by emphasizing the *four convictions* rather than simply the jury's finding that Holman was guilty of a murder committed in the course of one or more forcible felonies, the remark might have led the jury to focus on the multiple convictions rather than on the finding of guilt and the aggravating factor. This possibility is enhanced by the fact that the trial judge, in his admonitions to the jury at the beginning of the sentencing hearing, reminded it that it had "previously found the defendant guilty of murder, as well as *** three separate counts of felony murder" and informed it that while it was to disregard the count of "murder" it was to "participate in the sentencing proceeding pertaining to the verdicts of guilty of felony murder." In fact, there appears to have been confusion on the part of the judge himself, as evidenced by the fact that in imposing an extended sentence on the intentional-murder count he considered "the factor [that there] has been a homicide for which he's been sentenced to death" as contributing to a finding of heinous conduct. In view of this it seems not unlikely that the jury was similarly led astray.

In his rebuttal closing argument the prosecutor also argued:

> "Counsel says that if you strip away deterrence and retribution there is no justification for capital punishment.

Well, ladies and gentlemen, the State of Illinois recognizes something known as self-defense. Self-defense, basically, is a situation where the State will sanction the taking of a human life where there is no other realistic alternative left.

For example, if tonight you were to return home and a loved one of yours, perhaps a daughter or son, is being viciously attacked, being sexually molested, and being knived, you don't have to tap that person on the shoulder and say, sir, pardon me, would you cease your attack upon my child.

The laws recognize an unquestioned right for us to use deadly force, if necessary, to prevent the killing of your child, as long as all realistic alternatives have been exhausted.

What does this have to do with this? Well, ladies and gentlemen, in my opinion, capital punishment is suicidal self-defense. We have a right, in fact, we have a duty to defend ourselves from the unprovoked malicious, savage attacks that were exhibited in this case.

\* \* \*

In my opinion, we have the right to use deadly force and send Mr. Holman to the electric chair if it will save other people's lives."

A short time afterward, the prosecutor stated:

"\* \* \* [I]n fact, mercy is afforded sometimes—in fact, in many cases where human lives are taken. The reason that mercy is afforded is that reasonable people can sit down and say, we understand that you killed someone, but we also understand why you did it. Therefore, we're not going to take your life, even though you took someone else's life.

A perfect example of that, ladies and gentlemen, is a situation where a spouse discovers that another spouse is cheating, in fact, catches him in the act. In a heat of passion and rage, just kills the other spouse or partner, if you will.

We call it voluntary manslaughter. It's still killing, and it's as a suicidal act of mercy, yes, sir, we know that you killed, killing is not a nice thing, it is a terrible thing,

but we afford you the mercy."

Holman argues, and we agree, that these statements misinformed the jury of the circumstances which make the death penalty appropriate. The prosecutor's argument focused the jury's attention on the legal concepts of self-defense and voluntary manslaughter, concepts which were not issues in the case and concerning which it was never instructed by the court. He conveyed the erroneous idea that the death penalty was proper in all cases except those which constituted voluntary manslaughter, and the equally erroneous notion that the jury had the same right to use deadly force against a defendant convicted of murder that an individual has against a person who threatens imminent bodily harm to him or to another. The likelihood of misleading the jury was enhanced by the prosecutor's explicit equation of "mercy" in sentencing with factors that mitigate a murder to manslaughter. While mercy is a relevant concept in deciding whether to impose the death penalty, it is determined in the context of the factors in aggravation and mitigation which the jury finds and weighs, factors which are not limited to the two that are pertinent in assessing whether a homicide constitutes voluntary manslaughter (see Ill. Rev. Stat. 1979, ch. 38, par. 9—2) or even to the ones specifically listed in the death penalty statute (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(c)). Such misstatements of the law in closing argument are improper, particularly where, as here, the legal principle misstated is a critical one in the case. *United States v. Bohle* (7th Cir., 1971), 445 F.2d 54, 71.

Holman finally points to numerous instances in which the prosecutor advanced his personal beliefs concerning the desirability of the death penalty. The prosecutor commenced his initial closing argument by stating, "[B]efore I get into the facts of this case and discuss some testi-

mony [or] some of the inferences, *** I'd like to talk to you about the death penalty. I'd like to share with you some of my thoughts, opinions, and hopefully persuade you to adopt those." He then initiated a general discussion of the various rationales for and against capital punishment, during which he said:

"I'd like to talk to you about another argument that is sometimes used, the death penalty simply does not deter. Folks, we cannot not [*sic*] statistically prove that capital punishment deters. I'll make that as a flat statement.

Oh, there are some studies which indicate perhaps one way or perhaps another, and there are some studies which strongly indicate that capital punishment deters and other studies conducted by some sociologist, penologist, perhaps not, but I see one big fallacy in that. When Mr. Lou here or Mr. Gallop called people on the phone, taking an opinion, he said, hey, have you ever thought about killing anyone today? Did you ever think about it in the past about going out and killing, and then deciding you wouldn't do it because we got the death penalty in the State of Illinois?

Do you really think that someone is going to tell you that he thought about killing someone but had decided not to do it because of capital punishment? Probably not.

So, let's examine the concept of deterrence, and let's approach it from what I consider to be a common sense point of view."

He then related that he had taken his seven-year-old son to view an electric chair on exhibit at the Will County fair and described his reaction as follows:

"My [son] looked at me and he asked me what it was, and I told him an electric chair, and he asked me what it does, and I told him—now, he was seven years old. I said, son, the electric chair kills people who kill other people. If you kill someone in this State, you may have to die and give up your own life.

It was very apparent to myself from just looking at his response that something was sinking in, because I assume those of you who have raised a family have proba-

bly told your children when you were rearing them that people who kill other people may forfeit their own lives. It is certainly a possibility. Hopefully, this thought is shared by millions throughout the country and hundreds of millions."

Shortly after this he stated:

"[B]ut what if capital punishment serves as a deterrent, as I believe it does, if it is the proper case for the imposition of the death penalty, and we can show and we believe that capital punishment deters some killings, so that some future victims', our fellow citizens' *** lives will be spared."

Later in his rebuttal, in response to defense counsel's suggestion to the jury that it was unjust for Holman to receive capital punishment while multiple murderers such as Charles Manson and Richard Speck did not, he argued:

"I want to tell you something. Those guys [Speck and Manson] certainly deserve[d] that. Just because the United States Supreme Court began hallucinating about the death penalty in 1972, and in my opinion, is what they did, they made a very . . .

MR. MARKESE [defense counsel]: I object to that, your Honor.

THE COURT: The word is inappropriate. You may comment on it, but not with that type of language, Mr. Petka.

MR. PETKA [State's Attorney]: In my opinion, they made a very tragic mistake, but the legislatures in this country were quick to react to their decision. Three quarters of the legislatures in this nation quickly reimposed the death penalty statute.

MR. MARKESE: I object to that argument, also.

THE COURT: He may make it. Objection overruled.

MR. PETKA: Because they felt capital punishment was appropriate."

In argument to the jury, counsel may not express his personal opinion concerning issues in the case unless his

opinion is based on the evidence. (*E.g., People v. Vriner* (1978), 74 Ill. 2d 329, 344, *cert. denied* (1979), 442 U.S. 929, 61 L. Ed. 2d 296, 99 S. Ct. 2858; *People v. Prim* (1972), 53 Ill. 2d 62, 77, *cert. denied* (1973), 412 U.S. 918, 37 L. Ed. 2d 144, 93 S. Ct. 2731.) The reasons for this rule at the guilt phase of a criminal trial include preventing the introduction of new material by a witness who cannot be cross-examined (*People v. Bitakis* (1972), 8 Ill. App. 3d 103, 108), preventing the jury from being led to believe that counsel has other information not presented at trial which might make his case more plausible (*United States v. Creamer* (7th Cir. 1977), 555 F.2d 612, 617, *cert. denied* (1977), 434 U.S. 833, 54 L. Ed. 2d 93, 98 S. Ct. 118), and simply discouraging appeals to the jurors' emotions. The rule is no less essential at the sentencing phase of a criminal case because of the substantial risk that a statement of opinion, if interpreted as supplemental evidence justifying a sentence of death, will distract the jury from properly weighing the aggravating and mitigating factors. See *State v. Woomer* (1981), 277 S.C. 170, 175, 284 S.E.2d 357, 359.

The prosecutor's reference to various studies and public opinion polls concerning the death penalty was improper for all of these reasons. At no point were any studies or polls introduced into evidence, and there was thus no evidentiary basis either for the prosecutor's description of the results of the scientific studies or for his speculation as to the reliability of the Harris and Gallup polls or the way they were taken. As the prosecutor's sources could not be checked, the jury had to accept on his own authority the assertions he made, assertions clearly intended to convince the jury to accept his opinion that capital punishment deters crime.

In addition, although the State may urge the imposition of death as a deterrent to murder (*People v. Lewis* (1981), 88 Ill. 2d 129, 149, *cert. denied* (1982), 456 U.S.

1011, 73 L. Ed. 2d 1308, 102 S. Ct. 2307), we held in *People v. Szabo* (1983), 94 Ill. 2d 327, 363-65, that description of a statistical relationship between the number of executions and the number of homicides in a jurisdiction served to focus undue attention on the notion of general deterrence at the expense of factors bearing on the individual defendant's character and crime. In this case, unlike what occurred in *Szabo,* no numerical statistics were recited, but a fairly lengthy general reference was made to scientific studies and two named polls whose methods were compared and whose conclusions were contrasted in the course of a long discussion of the deterrence rationale. Our observations in *Szabo* are relevant here:

> "The prosecutor's reference to the supposed general deterrent effect of the death penalty could only divert the jury's attention from the aggravating and mitigating factors \*\*\* and focus it upon an extraneous consideration. \*\*\*
>
> The remarks \*\*\* were also inflammatory and prejudicial. \*\*\* [They] created a grave risk that the jury would be influenced to impose the death penalty out of fear and a sense of outrage, not toward this particular defendant or his acts, but towards criminal defendants in general." 94 Ill. 2d 327, 364-65.

We find the other passages that we have quoted inappropriate for similar reasons. There was no evidence adduced at trial as to any individual's reaction to the possibility that killing another may lead to the forfeiture of one's own life; the prosecutor could not be meaningfully questioned concerning his description of his son's reaction, which lent undue credence to his contention that capital punishment deters crime generally. In addition, his reference to his small boy may have served to enlist the jury's sympathy. The statement that "we can show and we believe that capital punishment deters some killings" simi-

larly had no evidentiary basis and suggested to the jury that the prosecutor had reliable information, outside the record, which proved his assertion. The prosecutor's opinion that the United States Supreme Court's 1972 decisions declaring capital punishment under existing statutes unconstitutional were "a very tragic mistake" resulting from "hallucinat[ions] about the death penalty" was clearly likely to elicit an emotional response, particularly when combined with the observation that "three quarters of the legislatures in this nation quickly reimposed the death penalty statute." The prosecutor's critical remarks went far beyond what defense counsel may fairly be said to have invited by his reference to Manson and Speck; in the context of rebuttal argument where the jury could assume that it was relevant to the sentencing decision, giving the jury the impression that the death penalty was favored by a significant majority of the nation's citizens distracted the jury from giving this case the individualized consideration essential in all death cases.

The State answers all of Holman's contentions with two arguments. The first is that because Holman offered no evidence of any mitigating factor the evidence in favor of the penalty that was imposed was overwhelming and the errors in closing argument, if there were any, were harmless beyond a reasonable doubt. (*People v. Dukett* (1974), 56 Ill. 2d 432, *cert. denied* (1974), 419 U.S. 965, 42 L. Ed. 2d 180, 95 S. Ct. 226; *People v. Skorusa* (1973), 55 Ill. 2d 577.) At the time it was to sentence Holman the jury had before it his claim, supported by his own testimony and that of his cousin and her husband, that he had been drinking prior to the events at the Townsend home and was drunk during the killing. This claim was rendered plausible by Mrs. Townsend's testimony at the guilt phase that Holman drove the wrong way on an interstate highway for a while before he realized what he was doing, and while she testified that Holman's eyes were not dilated she de-

scribed their appearance as "wild" and admitted that his breath smelled faintly of alcohol. This evidence of intoxication, if believed by the jury, would have established a factor which could have been used in mitigation. (*People v. Gleckler* (1980), 82 Ill. 2d 145, 169-71; *People v. Walcher* (1969), 42 Ill. 2d 159, 166; compare Ill. Rev. Stat. 1979, ch. 38, par. 9—1(c)(2) (diminished capacity in the form of "extreme mental or emotional disturbance" is a mitigating factor).) We also note that Holman for the first time in the sentencing hearing raised the contention that another person committed the homicide; any reasonable doubts the jury may have had as to whether Holman was the triggerman could have been considered in mitigation even though they came too late to be inconsistent with a verdict of guilt. Although this version of events does strike us as somewhat implausible, it is not so inherently so as to convince us that no reasonable-minded juror could have believed it. In any event, we cannot say, as the State does in its brief, that the evidence in favor of the death penalty in this case was "overwhelming" or conclude with conviction that the jury would have balanced the aggravating and mitigating factors in the same way had the prosecutor not made the remarks we have identified. The errors were therefore not harmless. See *People v. Lampkin* (1983), 98 Ill. 2d 418, 430-31; *People v. Walker* (1982), 91 Ill. 2d 502, 517; *People v. Mills* (1968), 40 Ill. 2d 4, 14.

The State's second response is that, with the one exception noted, Holman failed to object to any of the prosecutor's statements. Ordinarily, a contention not made in the trial court is waived on appeal (see, *e.g., People v. Jackson* (1981), 84 Ill. 2d 350, 358-59; *People v. Carlson* (1980), 79 Ill. 2d 564, 576). While our rules permit a reviewing court, in its discretion, to consider "[p]lain errors or defects affecting substantial rights" even though no objection was made to them at trial (87 Ill. 2d R. 615(a)), such consideration is normally granted only when "it [is] plainly appar-

ent from the record that an error affecting substantial rights was committed" (*People v. Jackson* (1981), 84 Ill. 2d 350, 359; *People v. Foster* (1979), 76 Ill. 2d 365, 380). However, because of the qualitative difference between death and other forms of punishment and the " 'high standard of procedural accuracy [that] is required in determining whether or not [the death] penalty will be imposed' " (*People v. Davis* (1983), 97 Ill. 2d 1, 26-27; *People v. Walker* (1982), 91 Ill. 2d 502, 517; see *Woodson v. North Carolina* (1976), 428 U.S. 280, 303-04, 49 L. Ed. 2d 944, 961, 96 S. Ct. 2978, 2991), this court has elected to address errors in death penalty cases which might have affected the decision of the sentencing jury. Thus in *People v. Szabo* (1983), 94 Ill. 2d 327, 354-55, 363-65, we considered several alleged errors, including the prosecutor's statements concerning the possibility of parole, notwithstanding the absence of any objection at trial and despite the absence of evidence which proved that the jury actually relied on them in imposing sentence. Similarly in *People v. Davis* (1983), 97 Ill. 2d 1, 26-27, we addressed the admission of evidence pertaining to an improper aggravating factor and prosecutorial references to the victim's family, errors whose potential for prejudicing the jury "should not be tolerated" (97 Ill. 2d 1, 27). Compare *People v. Free* (1982), 94 Ill. 2d 378, 425, *cert. denied* (1983), 464 U.S. 865, 78 L. Ed. 2d 175, 104 S. Ct. 200, and *People v. Lewis* (1981), 88 Ill. 2d 129, 149, *cert. denied* (1982), 456 U.S. 1011, 73 L. Ed. 2d 1308, 102 S. Ct. 2307, in which alleged errors which were held to have been waived were nonetheless considered by this court.

The errors we have discussed, considered together, require a new sentencing hearing. (See *People v. Ramirez* (1983), 98 Ill. 2d 439, 473; *People v. Walker* (1982), 91 Ill. 2d 502, 517.) Most of the improper comments occurred in the course of a long discussion of the justifications for the death penalty in general, a circumstance which itself might

tend to distract a jury's attention from the individual char-
acter of the defendant and his crime. The prejudicial effect
of warning the jury that Holman might kill a prison guard
and escape to kill again was probably such that it could not
have been cured by an admonition to the jury following an
objection. (See *People v. Yates* (1983), 98 Ill. 2d 502, 538.)
Moreover, the objection which Holman did raise to the
statement concerning the Supreme Court's disapproval of
our 1972 death penalty statute failed to elicit such an ad-
monition or occasion the striking of the offending remarks.

Having determined that Holman is entitled to a new
sentencing hearing on the murder conviction, we should
not consider whether there were *Witherspoon* violations in
the selection of his jury or whether Holman received effec-
tive assistance of counsel at the sentencing hearing. (*Peo-
ple v. Ramirez* (1983), 98 Ill. 2d 439, 459.) Nor need we
consider whether Officer Brown's testimony in the sentenc-
ing hearing was proper or whether the death penalty stat-
ute is constitutional, in view of the possibility that those is-
sues may not arise again in the proceedings following the
remand. Similarly, we do not address Holman's contention
that his 1968 conviction on a guilty plea of reckless con-
duct and unlawful use of a firearm may not be used as an
aggravating factor in this case because he was not repre-
sented by counsel on that occasion and did not validly
waive his right to counsel. We have no way of knowing
what the record will show in this regard in the new sen-
tencing hearing.

## V. THE SENTENCES ON THE NONCAPITAL CONVICTIONS

Holman finally requests us to remand the convictions
of armed violence and home invasion for resentencing.
He contends that the trial judge improperly imposed ex-
tended sentences for both offenses based on a finding of
heinousness made solely in the context of one of them

and pronounced a sentence for armed violence in excess of the maximum extended term which can be imposed for the underlying Class 1 felony of aggravated kidnaping (Ill. Rev. Stat. 1979, ch. 38, pars. 10—2(b)(2), 1005—8—2(a)(3)). As the State specifically agrees with these contentions and concurs in Holman's request, we direct the circuit court to also resentence Holman on the armed-violence and home-invasion convictions.

### VI. CONCLUSION

We affirm Holman's conviction of felony murder based on armed robbery, as well as his convictions of armed violence and home invasion. We vacate the death penalty and the convictions of intentional murder and felony murder based on burglary, and remand the cause for resentencing on the murder, armed-violence and home-invasion convictions consistent with what is said in this opinion.

*Affirmed in part and reversed in part; sentences vacated; cause remanded, with directions.*

CHIEF JUSTICE RYAN, concurring in part and dissenting in part:

I concur in that portion of the opinion upholding the conviction of the defendant; however, I dissent from the majority's conclusion that the death penalty must be vacated.

Once again, I deplore the lack of consistency in the application of waiver—plain error demonstrated by the opinions of this court. I wrote at length on this subject by way of dissent in *People v. Szabo* (1983), 94 Ill. 2d 327, 369 (Ryan, C.J., concurring in part and dissenting in part). This lack of consistency is demonstrated by *Szabo* and *People v. Free* (1983), 94 Ill. 2d 378, which appear one following the other in the Illinois Reports. Both

were death penalty cases. *Free* held that the failure of the defendant to object to the introduction of certain evidence and the comments made by the prosecutor during final argument prevented the raising of those questions on appeal. (*People v. Free* (1983), 94 Ill. 2d 378, 419, 425.) However, the *Szabo* court held that unobjected-to remarks by the prosecutor in closing argument could be urged as error on appeal by virtue of the plain error doctrine. (*People v. Szabo* (1983), 94 Ill. 2d 327, 362.) In my partial dissent in *Szabo* I noted the inconsistencies in *Szabo* and *Free* and stated that there was a compelling need for this court to establish a degree of certainty in the application of plain error. *People v. Szabo* (1983), 94 Ill. 2d 327, 370. (Ryan, C.J., concurring in part and dissenting in part.)

The continuation of the uncertainty of the application of plain error in capital cases, as demonstrated by the opinion in the case now before us, raises a further serious question. One commentator had this to say to this court's vacillation on the waiver – plain-error question:

> "Many modern [Illinois] cases are implicitly or explicitly contradictory, exemplifying a basic conflict among the various justices of the Illinois court regarding interpretation of the plain error exception. This conflict among the justices has led to the problems predicted by writers who, with great prescience, asserted that discretion in the context of procedural defaults in a sure road to unfair and arbitrary results." Wangerin, *"Plain Error" and "Fundamental Fairness": Toward a Definition of Exceptions to the Rules of Procedural Default,* 29 DePaul L. Rev. 753, 784 (1980).

The author quoted above suggested in the article that the impression given by the opinions of this court on the plain error issue and the differences of opinion among the members of this court on that subject may have produced some judgments that may well be based merely

upon the "luck of the draw"; that is, the result may depend upon which judge writes the opinion. If this is the case, are we not perilously close to the situation described by the oft-quoted statement of Justice Stewart:

> "These death sentences are cruel and unusual in the same way that being struck by lightning is cruel and unusual." *Furman v. Georgia* (1972), 408 U.S. 238, 309, 33 L. Ed. 2d 346, 390, 92 S. Ct. 2726, 2762 (Stewart, J., concurring).

In the case now before us, as in *Szabo*, the comments of the prosecutor which the opinion finds objectionable were not objected to. The court in this case has conjectured as to what the effect of these unobjected-to comments may have been. The opinion contains such language as "the likelihood that this occurred," "had potential for distracting the jurors," "the remarks might have led the jury," "this possibility is enhanced," "it seems not unlikely that the jury," "the likelihood of misleading the jury was enhanced," "may have served to enlist the juror's sympathy," and several other such speculative statements.

That the prosecutor's comments "might" or "might not" have had such conjectured effect on the jury is not the test used in determining whether or not the plain error exception is to be applied. If an alleged trial error is not objected to, the rule is that it cannot be raised on review. Waiver, or "procedural default," as it is sometimes referred to, constitutes the general rule. The plain error doctrine is a limited exception to this rule. The alleged error, in order to fall within this exception, must be so serious that it reasonably appears that the jurors have "been influenced or prejudiced to the extent that they could not be fair or impartial." *People v. Carlson* (1980), 79 Ill. 2d 564, 578.

We have held in our decisions that it is appropriate to consider on review unobjected-to trial error: (1) which

deprives an accused of a substantial means of enjoying a fair and impartial trial or (2) which occurs in criminal cases in which the evidence is closely balanced. *People v. Carlson* (1980), 79 Ill. 2d 564, 576-77; *People v. Howell* (1975), 60 Ill. 2d 117, 121; *People v. Pickett* (1973), 54 Ill. 2d 280, 283.

Likewise, the Federal cases recognize that plain error is a doctrine to be strictly and sparingly applied. The Supreme Court has stated that plain error "grants the courts of appeals the latitude to correct *particularly egregious errors* on appeal regardless of a defendant's trial default." (Emphasis added.) (*United States v. Frady* (1982), 456 U.S. 152, 163, 71 L. Ed. 2d 816, 827, 102 S. Ct. 1584, 1592.) The Federal courts of appeal have also recognized that plain error must be used sparingly and only in situations where it is necessary to prevent a great miscarriage of justice. See *United States v. Gerald* (5th Cir. 1980), 624 F.2d 1291, 1299; *United States v. DiBenedetto* (8th Cir. 1976), 542 F.2d 490, 494; *United States v. Mooney* (8th Cir. 1969), 417 F.2d 936, 939; *Eaton v. United States* (5th Cir. 1968), 398 F.2d 485, 486; *Black v. United States* (8th Cir. 1962), 309 F.2d 331, 342.

Conjecturing that the unobjected-to comments of the prosecutor *may have had* some prejudicial effect upon the jury just does not satisfy the rigid standards that have been established for the application of plain error. Plain error was created to ameliorate the hardships of the waiver (procedural default) rule. It was not created for the purpose of authorizing a nitpicking excursion through the record to find some conjectured prejudice upon which to base the reversal of a conviction or, as in this case, the vacation of a death penalty. The vacation of the death sentence in this case is based solely upon some conjectured prejudice stemming from statements by the prosecutor to which the defense counsel at trial

elected not to object.

My dissent is not based solely on the fact that the majority elected to apply plain error instead of holding that the alleged errors were waived. I have examined the final arguments of both the prosecutor and defense counsel in detail, and I do not consider that the comments of the prosecutor constituted reversible error.

The opinion, under the heading, "The Sentencing Phase," first discusses the statements made by the prosecutor concerning the justifications for the death penalty. The discussion centers on the arguments the prosecutor made concerning deterrence as a justification. The majority quotes a paragraph of the prosecutor's argument, which is followed by three asterisks indicating that some of the argument was omitted. (103 Ill. 2d at 161-62.) The part of the argument omitted, as represented by those three asterisks, constitutes six pages of the transcript. The paragraph quoted constitutes a part of the argument which refutes the general contention of those opposed to the death penalty that capital punishment serves no useful purpose. It does not relate specifically to the subject of deterrence. Following the quoted paragraph in the transcript is a discussion refuting the argument that the death penalty should not be imposed because a killer may be rehabilitated. This part of the argument is not quoted in the opinion. This is followed then by a discussion refuting the contention that the death penalty does not deter. This also is not set out in this part of the opinion. The second paragraph quoted in the opinion which appears below the three asterisks relates to the prosecutor's argument refuting this contention that the death penalty does not deter and is introduced by the following statement not quoted in the opinion: "But let's now approach it from the point of view of those who are opposed to the death penalty, [who] state that capital punishment does not deter other

people and we simply shouldn't have it." The part of the argument which is then .quoted in the opinion below the three asterisks (103 Ill. 2d at 162) sets forth the justification for the death penalty, even if one accepts the fact that the death penalty does not act as a deterrent to others. This is again followed by three asterisks between the paragraphs. The quoted part of the argument following these asterisks seems to be an assertion that "we can show and we believe that capital punishment deters some killings." This is not the context in which that statement was made. The part omitted, as indicated by the asterisks, ties these two paragraphs together all as a part of the same argument. The part omitted immediately following the words "prison guards" in the paragraph preceeding is as follows, "but what if capital punishment serves as a deterrent, as I believe it does if it is a proper case for the imposition of the death penalty." These two paragraphs then, when read in proper context, simply argue that even if we accept the view of those who oppose the death penalty that capital punishment does not deter other people, capital punishment is justified for the reasons stated in that paragraph. If it does serve as a deterrent, then it is justified as stated in the second paragraph. This entire argument is simply and clearly a statement by the prosecutor that the death penalty is a justified form of punishment whether or not it has a deterrent effect on others. To say, as the majority does, that "the clear import of the prosecutor's words is that the jury, by sentencing Holman to prison, would run the risk that he would kill a prison guard or would escape and kill again" is a gross distortion. Holman was never referred to in this part of the argument. This was a general discussion of the death penalty, the sanctity of human life, and deterrence and retribution. It was not until some three pages later in the transcript that the prosecutor stated, "now I'd like to talk a

little bit about this case." He then turned from the general discussion I previously mentioned to the specifics of this case. The statements which the opinion finds objectionable were simply arguments by the prosecutor pointing out to the jury the justifications for the imposition of the death penalty. In *People v. Lewis* (1981), 88 Ill. 2d 129, 149, this court held that a prosecutor could properly urge the imposition of death as a deterrent to murder.

The opinion next finds something wrong in certain references by the prosecutor in his rebuttal closing argument to the fact that the decedent and his family had substantial accomplishments in spite of adversity. (103 Ill. 2d at 165-66.) The opinion finds that these statements and reference to the decedent's family were not invited by the defense counsel's closing argument and constitute error. I do not agree. As to the references to the decedent's family, defense counsel in his closing argument, urging that the death penalty not be applied in this case, stated, "and it is not just the fact that Tafford Holman has a young baby, it's not just the fact that he does have family somewhere. He's got sisters." After having made the defendant's family a focal point in arguing against the death penalty in this case, it is no wonder that defense counsel did not object to the incidental reference to the decedent's family. Further, a substantial part of defense counsel's argument was based on the contention that our criminal justice system had failed. Counsel talked about the defendant's experience in the courts as a juvenile and about rehabilitation. He concluded by urging that we "correct the aberrations in our society that have created the Tafford Holmans and Richard Specks and the Mansons." Defense counsel placed the blame on society for the fact that Holman had killed. It was a logical response to that argument for the prosecutor to state "you can get ahead in this country if you truly try to make something of yourself." He then

went on to refer to Mrs. Townsend and her children as an example of the truth of that statement. I cannot understand how the majority can conclude that the statements by the prosecutor were not invited by the argument of defense counsel to the effect that because of unfortunate circumstances and the errors of society the defendant Holman never had a chance.

The majority conjectures that the prosecutor's reference to four convictions of murder *might have* "led the jury to focus on the multiple convictions rather than on the finding of guilt and the aggravating factor." (103 Ill. 2d at 168.) I do not understand what deficiency in the prosecutor's argument the majority finds to be erroneous. The jury knew that only one person had been killed. It was also well aware of the fact that it had returned verdicts of guilty on three counts of felony murder and one count of murder. To say that some prejudice *might have* flowed from the prosecutor's simple recital of facts already within the jury's knowledge is just pure speculation.

The opinion also takes issue with the prosecutor's discussion of self-defense, voluntary manslaughter, and mercy. (103 Ill. 2d at 168-70.) The opinion refers to these remarks as misstatements of the law. They are not. The discussion of the prosecutor concerning self-defense was in response to the defense counsel's statement: "If you strip away deterrence and retribution there is no justification for capital punishment." The prosecutor responded that self-defense is justifiable homicide. He then gave an example of self-defense and likened the death penalty to a form of societal self-defense. He concluded that argument by urging that "we have the right to use deadly force and send Mr. Holman to the electric chair if it will save other people's lives."

The above argument had nothing to do with the argument concerning mercy and voluntary manslaughter, al-

though the opinion sets them out as though they are all a part of the same argument. The prosecutor's statement concerning mercy and voluntary manslaughter were in response to what he characterized as the defense counsel's plea for mercy. The prosecutor argued that despite the fact that the defendant was utterly merciless, in that he had shot the 17-year-old boy and left him to die on the floor, and had then tried to kill the boy's mother, his counsel was urging the jury to have mercy. The prosecutor went on to state that if the jury chose to afford Mr. Holman mercy, it was within its power to do so. The prosecutor followed that statement with the part of the mercy argument that is set forth in the opinion. (103 Ill. 2d at 169-70.) With this background we have a better understanding of the nature of the argument. The discussion by the prosecutor in no way limited mercy to the factors pertinent in assessing whether a homicide constitutes voluntary manslaughter as the opinion suggests. The voluntary-manslaughter example is clearly labeled in the argument as only an example. There clearly was no misstatement of legal principles critical to the case as the opinion asserts.

The opinion next refers to "numerous instances in which the prosecutor advanced his personal beliefs concerning the desirability of the death penalty." (103 Ill. 2d at 170.) The personal beliefs which the prosecutor allegedly asserted were general statements concerning the death penalty. This is not a case where the prosecutor stated his opinion as to the guilt of the defendant or as to the truth or falsity of particular facts in issue or evidence presented, all of which have been held to constitute error. (See *People v. Vriner* (1978), 74 Ill. 2d 329, 344; *People v. Prim* (1972), 53 Ill. 2d 62, 77.) The desirability of the death penalty was not an issue in this case. That had been decided by the legislature of this State. The prosecutor was simply restating arguments in favor

of the penalty.

As to deterrence, the prosecutor did not assert the specific results of any studies or any public opinion polls concerning the death penalty. He made no reference "to various studies and public opinion polls concerning the death penalty" as the opinion asserts. (103 Ill. 2d at 173.) Thus the facts in this case are in no way similar to those references to statistics not in evidence which were held to be error in *People v. Szabo* (1983), 94 Ill. 2d 327, 363-64. The prosecutor's reference to Mr. Harris and Mr. Gallup was not a reference to public opinion polls taken by those pollsters. Nor was there any implication as to the results of any such poll. It was simply a reference to the manner in which such polls are taken and the possibility that those polled would be reluctant to answer completely and fairly.

The prosecutor stated that as to the deterrent effect of the death penalty it cannot be statistically proved that capital punishment deters. He stated that there were studies that indicated both that it was a deterrent and that it was not. Defense counsel, in his final argument in response to the prosecutor's statement that it cannot be statistically proved that capital punishment deters, stated, "He's right. Where is the evidence?" Thus, there was no assertion to the jury that there were statistics that proved that capital punishment acted as a deterrent on the criminal activities of others, and the response by defense counsel agreeing with the prosecutor's statement could leave the jury with only one impression, that is, that there was no such statistical evidence. The opinion acknowledges that this case, unlike *Szabo*, recited no statistics but somehow seems to think that the law as announced in *Szabo* also condemns the general argument made to the jury in this case.

The opinion asserts that the prosecutor's reference to his small boy "may have served" to enlist the jury's

sympathy. (103 Ill. 2d at 174.) However, the defense counsel likewise referred to his son by stating in his closing argument:

"My young child asked me what I had been doing for the past four or five weeks. I told him about my client, and I, quite frankly, told him that I pleaded for a condemned man. I would like to think that there is hope."

It would therefore appear that any sympathy that might have been envoked by the prosecutor's comments was evenly offset by the remarks of defense counsel. The unobjected-to comment by the prosecutor opened the door for defense counsel to make his sympathy-evoking argument. Now the majority of this court finds error in the prosecutor's even though used to defendant's advantage.

The opinion likewise finds error in the prosecutor's critical comments concerning the Supreme Court's decision outlawing the death penalty. (103 Ill. 2d at 172.) During defense counsel's argument to the jury he raised the question as to why Speck and Manson had not received the death penalty since they had committed multiple murders, whereas Holman had committed only one murder. The prosecutor had the right to tell the jury that Speck and Manson were not sentenced to death because the death penalty statutes in existence at that time had been held unconstitutional. (See *People v. Speck* (1972), 52 Ill. 2d 284; *People v. Manson* (1976), 61 Cal. App. 3d 102, 132 Cal. Rptr. 265.) He stated that the Supreme Court "began hallucinating about the death penalty in 1972." Defense counsel objected, and the court struck the word "hallucinating" but permitted the prosecutor to comment on the action of the Supreme Court. The prosecutor then stated, "In my opinion, they made a very tragic mistake." This was not an expression of opinion on an issue in the case. It was simply a statement on the controversial issue that was and is constantly aired in the media and of which the jury had to

be aware. I cannot see how this statement could have prejudiced the jury. The opinion also states that in his statement on this subject the prosecutor gave "the jury the impression that the death penalty was favored by a significant majority of the nation's citizens." (103 Ill. 2d at 175.) There is not one word in the prosecutor's final argument that implies that "the death penalty was favored by a significant majority of the nation's citizens." What he did state, and this is a matter of general public knowledge, is that "three-quarters of the legislatures in this nation quickly reimposed the death penalty statute." The use of the phrase "three-quarters of the legislatures" may not be exactly accurate, although it is approximately so. A recital of this matter of general public knowledge which is not misleading certainly cannot be said to have prejudiced the defendant.

I have attempted to point out that the comments found by the majority to constitute reversible error not only did not constitute plain error, warranting their consideration in the absence of an objection, but also did not constitute error warranting reversal even if they had been properly preserved by objections. The majority opinion has combed the final argument of the prosecutor, has lifted statements out of context, has applied unreasonable inferences to statements that were made, and has used the plain error concept as an instrument for vacating a death penalty, when all else failed.

The legislature, as a body representative of the people of this State, has decreed that death is an appropriate penalty for murder when certain aggravating factors are present. This court has held that the death penalty statute enacted by the legislature is constitutional. (*People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531.) Our criminal justice system is founded on an adversarial basis. Certain procedural rules have come to be accepted as the means of maintaining an appropriate balance in

such an adversarial system and of insuring a fair trial to both the defendant and the People. These procedural rules include the principles of waiver and plain error. It is the court's function to apply the constitutional laws enacted by the legislature, and in doing so, it should follow established rules of procedure. As distasteful as the penalty of death may be, we must, nonetheless, apply it in cases in which it has been properly found by the sentencing body to be appropriate. We should not bend or distort the accepted procedural rules in order to circumvent that penalty in a particular case. Also, we must not construe procedural rules, or apply them in such a rigid manner, that we thwart the will of the people by making it nearly impossible to apply the death penalty statute enacted by the legislature. By applying the test of what prejudicial effect the prosecutor's argument "might or could have had" on the jury, by examining each statement of the prosecutor out of context, and by drawing conjectured inferences therefrom, it is doubtful if any final argument for the prosecution could be found free from error. I therefore dissent from that portion of the majority opinion which vacates the penalty of death.

UNDERWOOD and MORAN, JJ., join in this partial concurrence and partial dissent.